### IN RE ESTATE OF CARL J. PETERSON.
### JOHN W. CLOVER v. AUGUSTA PETERSON.[1]

August 26, 1938.

No. 31,610.

[1]Reported in 281 N. W. 275.

338

*Jenswold & Dahle,* for appellant.

*Fowler, Youngquist, Furber, Taney & Johnson,* for respondent.

GALLAGHER, CHIEF JUSTICE.

Appellant's husband, Carl J. Peterson, died testate April 13, 1916. After devising their homestead to his wife, Augusta Peterson, who is appellant here, and disposing of the bulk of his personal property by specific bequests, he made certain general bequests. His executor was directed to set aside $8,000 to be invested "in farm mortgages or bank certificates of deposit" as the executor should see fit and to pay the income therefrom to appellant. If alive 15 years after his death, "the said sum of eight thousand ($8,000) dollars shall be paid to her," but if she died before that moment the fund was to be distributed among designated persons. The other recipients of general legacies were his parents, who were to be paid $500, and four of his children, whose bequests totaled $7,500. To secure money to establish the fund and to discharge the other legacies, the will directed the executor to sell his farm of 280 acres. The only other resources available for these purposes were six shares of stock in a local starch company and one share in a local coöperative creamery. There was no cash. The dispute is strictly limited to administrative transactions affecting the general legacies and the assets devoted to them; other aspects of the will and of the estate may be ignored.

May 26, 1916, letters testamentary were granted respondent, John W. Clover, the executor named in the will. Toward the close of that year an inventory and appraisement listed the total value of the

farm at $17,000; it was subject to a mortgage of $2,500. The starch stock was estimated to be worth $300 and the coöperative share $30. These assets were dedicated not only to the payment of the general legacies but also to the satisfaction of the allowed claims of creditors and the expenses of administration.

At the time of his death testator was under a contract obligation to his parents to support them, and they were lienors of a part of the farm to secure its performance. In December, 1916, they consented to release their lien and claim for support in consideration of the payment of their legacy of $500 and $300 in addition. The probate court in its license to settle the claim recited the complete terms of the settlement, but, feeling evidently that the legacy was absolutely due, made its order in January, 1917, authorizing settlement of the claim for support for $300. Respondent was also authorized in the same month to increase the mortgage on the farm to $5,000 to secure funds to pay off these sums as well as the allowed claims of other creditors. The March following respondent paid grocery bills amounting to $88 incurred by the parents after testator's death.

In November, 1917, respondent sold 80 acres for $5,500 cash. A month later he disposed of the remaining 200 acres to one Nelson under a contract for deed requiring the payment of $16,500. According to its terms, $1,000 was to be paid at the time the contract was made, a like amount April 1 following, $500 annually thereafter through April 1, 1923, $750 annually through April 1, 1930, the balance April 1, 1931, and six per cent interest on unpaid principal. Nelson met principal and interest payments until the spring of 1921, when he defaulted the principal payment. In 1922 he defaulted as to both principal and interest. In 1923 he brought the interest payments up to date and paid the three principal payments then due from the proceeds of the sale of 40 acres of the farm which he persuaded respondent to conclude with a third party for $1,500. In January, 1924, he surrendered his interest in the land by quitclaim deed to respondent. During the life of the contract he paid $4,500 of the principal sum and $4,493.60 in interest.

Upon the sale of the 80 acres in the fall of 1917, $1,700 was paid the mortgagee to secure its release from the mortgage; for the same reason $700 was paid on the mortgage at the time of the sale of the 40 acres. The total mortgage indebtedness was increased by a second mortgage for $1,000 consummated in the spring of 1922. The greatest part of the receipts of cash listed above was applied to the legacies provided for the children. Seven hundred dollars was paid for this purpose in 1917; $3,000 in 1918; $800 the succeeding year; the year following $2,314; in 1921 $320; and in 1922, when the last payment was made, $850 was devoted to this purpose. No order of the probate court decreeing this disposition of the funds was ever made.

In 1918 and again in 1927 respondent's intermediate accounts setting forth all of these receipts and disbursements were settled and allowed. Notice of the hearings was given appellant, but she neither appeared nor entered objections to the account. At the close of the latter year respondent's payments to or on behalf of appellant amounted to $2,530.24.

Since Nelson's withdrawal from the contract for deed the farm has been rented on shares, but the income it produced proved scarcely sufficient to pay current expenses. Early in 1927 it became necessary to make extensive repairs to the barn. Appellant was informed of the defects and of the plans respondent proposed to follow in repairing them as well as of the lack of funds in the estate with which to carry them out. The work was financed by loans secured by respondent and his own advances. In January, 1928, appellant loaned $2,600 to the estate to retire the loans and to reimburse respondent.

In 1931, about 15 years after testator's death, respondent filed his final account, and thereby began a litigious epilogue to his administration which has embraced a hearing in the probate court, two trials in the district court, and this, the second appeal to this court. See In re Estate of Peterson, 197 Minn. 344, 267 N. W. 213. The assets reported were the same shares of stock, now worthless, and the remaining 160 acres of land. The latter is mortgaged for

$3,600, and $1,390.22 is owed appellant on her loan. Although the legacies to the parents and the children have been paid, no fund is in existence to satisfy appellant's claim, nor were there any other assets from which the fund could be created.

The probate court surcharged respondent with the amounts paid the parents and children and for the appraised value of the stock; his claim for compensation as representative was denied, as was his prayer for an allowance of attorney's fees. Respondent appealed to the district court, which arrived at opposite conclusions in all of these matters, and this appeal is taken from its judgment. Seventy-five assignments of error are preserved, but appellant forbears discussing many of them and conveniently groups the remainder under a few heads.

For the purpose of this opinion, the items which appellant insists should be surcharged against respondent in his final account may be considered under two subheads: (1) The legacies paid to decedent's children during the course of administration, and (2) all other contested items, including principally representative's fees, counsel fees, and the stock which became worthless before being disposed of by respondent.

■ The vital question for determination concerns the payment to decedent's children of legacies aggregating $7,500. Appellant contends that her bequest of $8,000 was entitled to priority in payment and bases her contention upon the claim that having waived her right to take under the statute and having elected to take under the will, she became a purchaser of her legacy, which put her in a preferred class if abatement of legacies became necessary.

Respondent counters with the argument that the legacies so paid were included in two intermediate accounts approved by the probate court after notice of hearing thereon to appellant and that the orders of the probate court settling and allowing the intermediate accounts are *res judicata* and not subject to collateral attack. He also argues that the payments to the children were made at the request of and with the consent of appellant and that by reason thereof she become estopped from challenging said payments.

Our conclusion that appellant is estopped by her conduct from now questioning the priority of the payments to decedent's children of the legacies provided in the will for them makes unnecessary a determination as to the-effect of the intermediate orders.

The trial court found:

"That prior to the payment of legacies to those legatees other than said Augusta Peterson, respondent herein, John W. Clover as executor consulted said respondent, with whom and near whom some of said legatees (decedent's children) were living in Isanti, Minnesota, and she declared and urged, in substance and effect, that by all means they be first paid, and she participated in arranging for and consented to the payment of the $500.00 legacy to Nels Peterson and wife, the father and mother of decedent, and the additional $300 paid them to settle their support and maintenance claim against the estate; that she knew from time to time when the several payments were to be and were made to these parties, and never made any objection thereto, and she was kept informed by the executor of the condition of the estate from time to time, and had ample opportunity to fully inform herself in relation thereto. For fifteen years she has acquiesced in the payment of these legacies. Some of the legatees are now insolvent and some are deceased."

From that finding the court concluded:

"That respondent, Augusta Peterson, is estopped to now assert a preferential right as widow of said decedent to have applied to the payment of her legacy under Article 'Fourth' of the will of said decedent, the cash expended by John W. Clover as executor under said will in payment of each of the cash legacies to Dora Lindbloom, Marshall Peterson, Torrey Peterson, Harrold Peterson, and Nels Peterson and wife, respectively."

We are of the opinion that the evidence was sufficient to sustain the finding referred to and that the conclusion reached follows as a matter of law. Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have

otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse, and who on his part acquires some corresponding right either of property, contract, or remedy. 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 3185; Dimond v. Manheim, 61 Minn. 178, 63 N. W. 495; Schaefer v. Nylin, 162 Minn. 170, 202 N. W. 439; LePak v. Hedberg, 170 Minn. 495, 213 N. W. 40.

The doctrine of estoppel *in pais* is founded in justice and good conscience and is a favorite of the law. It arises when one by his acts or representations, or by his silence when he ought to speak, intentionally or through culpable negligence, induces another to believe certain facts to exist, and such other rightfully acts on the belief so induced in such manner that if the former is permitted to deny the existence of such facts it will prejudice the latter. 2 Dunnell, Minn. Dig. (2 ed. & Supp.) § 3187.

This court in the early case of Dimond v. Manheim, 61 Minn. 182, 63 N. W. 497, laid down some general rules pertaining to the doctrine of estoppel. They are:

"First. To create an estoppel, the conduct of the party need not consist of affirmative acts or words. It may consist of silence or a negative omission to act when it was his duty to speak or act. Second. It is not necessary that the facts be actually known to a party estopped. It is enough if the circumstances are such that a knowledge of the truth is necessarily imputed to him. Third. It is not necessary that the conduct be done with a fraudulent intention to deceive, or with an actual intention that such conduct will be acted upon by the other party. It is enough that the conduct was done under such circumstances that he should have known that it was both natural and probable that it would be so acted upon."

Beneficiaries of an estate may conclude themselves by acquiescing in or consenting to improper allowances. Dunnell, Minn. Prob. Law, § 1055, note 22; In re Martin, 196 N. Y. 415, 90 N. E. 46. Probate courts may apply the equitable doctrine of estoppel in any matter involved in administration. Dunnell, Minn. Prob. Law,

§ 25, note 59, §§ 690, 1060; Brook v. Chappell, 34 Wis. 405. The interest of a surviving spouse in an estate may be lost by estoppel. Dunnell, Minn. Prob. Law, § 106, note 14; Erickson v. Robertson, 116 Minn. 90, 133 N. W. 164, 37 L.R.A. (N.S.) 1133, Ann. Cas. 1913A, 493.

Applying the principles referred to, it appears to us that it would be inequitable to permit appellant, after authorizing the executor of the estate to pay the legacies to the children and advising him that such was the intention of her deceased husband and consenting to such payment, afterwards and when it appears that the estate may not pay out in full, to change her mind and insist upon her strict legal rights. Even though she did not expressly consent to the payment of the legacies to the children, she had full knowledge thereof and acquiesced therein. Her conduct in not questioning the payment of the legacies to the children was at least an element that might be taken into consideration by the trial court in determining whether facts existed which were sufficient to constitute estoppel. Appellant's silence for such a long period of time with knowledge that the payments had been made added strength to the court's finding of consent.

There appears to be no charge of fraud or dishonesty made against the executor. The most serious charge that might be preferred would be a somewhat loose handling of the estate in that authority of the court in some instances should have been procured instead of procuring approval after acting. In any event, it appears that he honestly administered the affairs of the estate and properly accounted for all funds turned over to him. A substantial part of the original assets are still in existence although depreciated in value. The same thing may well have happened had the assets all been sold for cash and converted into other securities. In any event, appellant was advised from time to time as to how the estate was being handled and registered no protest thereto.

Appellant claims that respondent should be charged with the appraised value of the stock for negligently failing to dispose of it while there was a market. The starch company returned dividends

until the spring of 1919, when it appears the value of the stock precipitously dropped to nothing and the company soon ceased to exist. The coöperative company earned fair dividends until the spring of 1920 but has paid nothing since that year. While the shares were bringing good returns appellant advised respondent not to dispose of them. She cannot now accuse him of improvidence. See note, 92 A. L. R. 436, 461.

Appellant's contention that respondent be charged with the unpaid balance of her loan to the estate is not well founded. The trial court found, and that finding is sustained by the evidence, that the repairs were necessary for the preservation of the property and that the cost was reasonable.

The decision of the district court is in all other respects approved.

The judgment appealed from is affirmed.

STONE, JUSTICE (concurring).

I concur in the result. Deferentially, I submit that there is no occasion to labor the proposition of equitable estoppel. The accounts of the representatives showing the payment of the contested items were formally settled upon due notice to appellant and after hearing. Just how does it come that the resulting order did not render the involved issues *res judicata* as against appellant? Compare In re Trusteeship Under Will of Melgaard, 200 Minn. 493, 274 N. W. 641.